## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION
## AT GREENEVILLE

| | | |
|---|---|---|
| TROY J. FOX and JEANENE FOX, parents of WHITNEY LEANNE FOX, deceased, and as custodians and guardians of Ryleigh Fox, a minor, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. _____ |
| COCKE COUNTY, Tennessee, a governmental entity; MAXWELL GRAYSON LAUGHTER, individually; TOWN OF Parrottsville, Tennessee, a governmental entity; RODNEY TRAVIS HAZELWOOD, individually; and JOHN and JANE DOES 1-5, individually, | ) ) ) ) ) ) ) ) ) | Jury Demanded |
| Defendants. | ) | |

_____

## CIVIL RIGHT AND WRONGFUL DEATH COMPLAINT
_____

Lance K. Baker, Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
First Horizon Plaza
800 S. Gay Street, Suite 1950
Knoxville, TN 37929
Tel: 865-200-4117
lance@lbakerlawfirm.com

*Counsel for Plaintiffs*

Case 2:24-cv-00088-JRG-CRW    Document 1    Filed 05/22/24    Page 1 of 42    PageID #: 1

**TABLE OF CONTENTS**

I.      NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.    PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.    Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.     FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.    Ms. Fox Is Wanted On Outstanding Warrants for Drug Charges, Failure to
              Appear, and a Probation Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.    The Officers Decide Not to Apprehend Ms. Fox at the Gas Station . . . . . . . . . 11

        C.    The Chase . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        D.    Ms. Fox Pulls Off Into a Field . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        E.    The Officers Block Ms. Fox's Exit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        F.    The Officers Exit Their Vehicles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        G.    The Officers Approach the Escalade with Guns Drawn and Aimed at Ms. Fox
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        H.    Officer Hazelwood Screams Conflicting Commands at Ms. Fox. . . . . . . . . . . 14

        I.    Ms. Fox Slowly Backs Away From the Officers as Officer Hazelwood
              Threatens to Shoot Ms. Fox . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        J.    A Terrified Ms. Fox Tells Officer Hazelwood That She Is Afraid He Will
              Shoot Her If She Gets Out . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        K.    Ms. Fox Slowly Backs Away from the Officers. . . . . . . . . . . . . . . . . . . . . . . . 16

        L.    Both Officers Open Fire As the Escalade Sits Running, But Stopped,
              Shooting Ms. Fox Thirteen Times, and Killing Her . . . . . . . . . . . . . . . . . . . . . 17

-ii-

M.      Neither Officer Attempted to De-Escalate the Traffic Stop Before Opening Fire on Ms. Fox . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

N.      Ms. Fox Died of "Gunshots to Head" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

O.      DA Pro Tem Allen Exonerates Lt. Laughter and Officer Hazelwood for Fatally Shooting Ms. Fox . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

P.      Ms. Fox Was Not an Imminent Threat to the Officers at the Time They Shot and Killed Her . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

V.     WAIVER OF IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VI.    CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        Count One – Violation of 42 U.S.C. § 1983 – Excessive Force Under the Fourth Amendment to the United States Constitution (Against Lt. Laughter and Officer Hazelwood, Individually). . . . . . . . . . . . . . . . . . . . . . . . . . 23

        Count Two – Violation of 42 U.S.C. § 1983 – Failure to Train (Against Cocke County) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        Count Three – Violation of 42 U.S.C. § 1983 Failure to Train under the Fourteenth Amendment to the United States Constitution (Municipal Liability) (Against Parrottsville) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Count Four – Battery (Against Cocke County and Lt. Laughter and Officer Hazelwood, Individually). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        Count Five – Negligence/Gross Negligence (Against All Defendants) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        Count Six – Intentional or Reckless Infliction of Emotional Distress (Against Lt. Laughter and Officer Hazelwood, Individually) . . . . . . . . . . . . . . 36

VII.   JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

VIII.  PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**COMES** TROY J. FOX and JEANENE FOX, parents of WHITNEY LEANNE FOX, deceased, and as custodians and guardians of Ryleigh Fox, a minor ("Plaintiffs"), pursuant to Tenn. Code Ann. §§ 20-5-101 through 20-5-117, and 42 U.S.C. § 1983, and file this Complaint against the Defendants: Cocke County, Tennessee ("the County"); Lieutenant Maxwell Grayson Laughter, individually ("Lt. Laughter"); the Town of Parrottsville ("Parrottsville"); Officer Rodney Travis Hazelwood, individually ("Officer Hazelwood"); and John and Jane Does 1-5, individually ("the Doe Defendants") (collectively, "Defendants").

## I. NATURE OF ACTION

> *"It has been clearly established in this circuit for some time that 'individuals have a right not to be shot unless they are perceived as posing a threat to officers or others.'"*[1]

1.      This civil rights action arises out of the fatal police shooting of Whitney Leanne Fox ("Ms. Fox") – age 36 and the mother of two-year old, Ryleigh Fox – in connection with the fatal police shooting by Officer Rodney Hazelwood, of the Parrottsville Police Department ("PPD"), and Lieutenant Maxwell Laughter, of the Cocke County Sheriff's Office ("CCSO"), following a car chase that ended in a grassy field in Bybee, Tennessee.

2.      Ms. Fox had outstanding drug-related, failure to appear, and probation violation warrants, issued eight months earlier. Lt. Laughter and Officer Hazelwood had been searching for her on May 23, 2023 and had ended their search. As they were sitting in their respective cars by the road, Laughter spotted Ms. Fox driving a 2007 Cadillac Escalade. The officers followed Ms. Fox to a gas station, but when they approached her, she pulled back onto the road.

---

[1] *Ciminillo v. Streicher*, 434 F.3d 461, 465-66 (6th Cir. 2006).

-1-

3.      Officer Hazelwood and Lt. Laughter gave chase. The chase lasted about ten (10) minutes, at which time Ms. Fox pulled into a grassy field off Fox Hollow Road in Bybee and came to a stop. Just sixty-eight (68) seconds later, the officers had fired twenty-two (22) rounds into the Escalade, hitting Ms. Fox a total of thirteen (13) times in the head and upper extremities, mortally wounding her. The officers' panic, pre-determination to use force, disregard for human life, failure to make any effort to de-escalate the traffic stop, and obvious lack of training unnecessarily turned what should have been a routine traffic stop into a deadly one that left Ms. Fox's children motherless.

4.      The officers claim that they opened fire and killed Ms. Fox because they believed they – but more specifically, Officer Hazelwood – faced "an imminent danger of death or serious bodily injury" from Ms. Fox. Although Ms. Fox was unarmed, the officers's use of deadly force was premised on the fact that she was in the driver's seat of the Escalade and the Escalade's various movements while the officers were on-foot in the field sufficiently threatened their lives, or at least Hazelwood's life, to justify their use of deadly force against Ms. Fox.

5.      Confronted with two gun-wielding officers screaming conflicting commands at her, *e.g.*,"open the door," "stop," "get out," the terrified Ms. Fox attempted to communicate with the screaming Officer Hazelwood – whose behavior was characteristic of an officer new to patrol and force incidents – indicating to him that she was afraid to get out of the vehicle because the officers would simply shoot her. Hazelwood ignored her and, like Lt. Laughter, not only made no attempt to de-escalate the traffic stop, but escalated it to a deadly stop, paying no attention to the possibility that Ms. Fox's children were occupants of the Escalade.

-2-

6. Here, neither officer – and especially Officer Hazelwood – was in imminent danger of being harmed by the unarmed Ms. Fox or by the Escalade. Lt. Laughter was fifteen feet away from the Escalade on the passenger's side when he fired into the non-moving vehicle, and was never in its direct path. Not once did Ms. Fox maneuver the Escalade toward Laughter. Officer Hazelwood, who was initially opposite Laughter's position and several feet away from the Escalade on the driver's side, had re-positioned himself to the front of the Escalade, and stood about twenty (20) feet away from the vehicle before the officers opened fire into the stopped Escalade.

7. The evidence is compelling that the officers' use of deadly force against Ms. Fox was unreasonable. Body-cam video reveals that once the officers approached the Escalade on-foot, Ms. Fox's movements were slow and deliberate, as she only maneuvered the Escalade *away from the officers*, not directly toward them, seeking to flee, not to injure the officers. While she inched the Escalade backwards when Officer Hazelwood was several feet away on the driver's side, the slowness and deliberateness of those movements presented no real danger to Hazelwood, who simply walked away and moved to the front of the Escalade.

8. Most importantly, the body-cam video also shows that the officers did not fire at Ms. Fox as the Escalade was "bearing down" on either officer, possibly creating a reasonable fear for his safety. Rather, they fired at Ms. Fox only after the Escalade had backed *away from* both of them and as it sat running . . . but not moving. And while Lt. Laughter describes Ms. Fox's "dropping" the Escalade into "drive" as what prompted him to open fire at her, the vehicle, in fact, never "bore down" on either officer, and appears not to have moved toward Officer Hazelwood immediately before the officers opened fire.

-3-

9. Although Laughter claims to have perceived danger for Hazelwood sufficient to justify his use of deadly force when Ms. Fox backed the Escalade *away from* the officers, the mere fact that a suspect is sitting in a car with the engine running is not, in and of itself, a sufficient reason for an officer to open fire, even if the officer has voluntarily placed himself in the potential path of the vehicle. To the extent Ms. Fox moved the Escalade forward, that did not appear to happen until after she was shot.

10. Nevertheless, after the shooting, Attorney General Pro Tem Kevin Allen ("DA Allen") exonerated both officers, finding that the shooting death of Ms. Fox was a justifiable homicide because the officers had a reasonable belief that Ms. Fox posed a threat of imminent death or serious bodily injury to them. The facts and evidence belie that incredibly unjust result.

11. The unconstitutional consequences of failing to train officers in the reasonable use of force, especially deadly force, are so patently obvious in this case that the Town of Parrottsville and Cocke County are liable under 42 U.S.C. § 1983. From their initial contact with Ms. Fox,[2] the officers' actions and lack of proper training unnecessarily and unreasonably escalated what should have been a routine traffic stop into one unnecessarily involving deadly force, and Ms. Fox's death. Even Officer Hazelwood has made that concession, stating that they should have "tried to block her in at the store." A reasonable, trained, skilled, or proficient officer in the same circumstances would not have believed that deadly force was necessary or measured for the circumstances.

---

[2]For example, since the officers and DA Allen all characterize the Escalade as a deadly weapon, and it is hardly disputed that a vehicle can serve such a function, the officers' decision to make the stop while Ms. Fox was inside the Escalade, rather than allowing her to exit the vehicle at the gas station, demonstrates the officers' lack of training.

-4-

12.    Defendants, acting under color of law, deprived Ms. Fox of her constitutional rights under the Fourth Amendment, and caused her wrongful death. By this action, brought under 42 U.S.C. § 1983 and Tennessee law, Plaintiffs make the following claims:

> Count One – 42 U.S.C. § 1983 – Excessive Use-of-Force (Under the Fourth Amendment (against Lt. Laughter and Officer Hazelwood, individually);
>
> Count Two – 42 U.S.C. § 1983 – Failure to Properly Train Officers with Respect to the Use of Force, Including Deadly Force (against the Town of Parrottsville;
>
> Count Three – 42 U.S.C. § 1983 – Failure to Properly Train Officers with Respect to the Use of Force, Including Deadly Force (against Cocke County);
>
> Count Four – Battery (against Cocke County, Lt. Laughter, individually, the Town of Parrottsville, and Officer Hazelwood, individually);
>
> Count Five – Negligence or Gross Negligence (against all Defendants);
>
> Count Six – intentional or reckless infliction of emotional distress (against Officer Hazelwood and Lt. Laughter, individually).

13.    Plaintiffs seek all compensatory damages available under the law, including, but not limited to damages for (a) excruciating physical pain and suffering before Ms. Fox's death; (b) severe emotional suffering and mental anguish before Ms. Fox's death; (c) lost earnings and/or loss of earning capacity in the future based on the probable duration of the 36-year old Ms. Fox's life if her death had not occurred; (d) loss of the enjoyment of the remainder of the probable duration of Ms. Fox's life if her death had not occurred; (e) funeral and burial expenses, all of which are recoverable by Plaintiffs; and (f) loss of society and companionship for the beneficiary of Ms. Fox, the minor child, Ryleigh Fox. Plaintiffs further request punitive damages against Officer Hazelwood

-5-

and Lt. Laughter, individually, as well as attorney's fees, costs, expenses, and all other available and appropriate relief.

## II. JURISDICTION AND VENUE

14.     This action is brought to redress alleged deprivations of constitutional rights as protected by 42 U.S.C. §§ 1983, 1988, and the Fourth Amendment of the United States Constitution, and for violations of Tennessee common law. Original jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

15.     This Court also has supplemental jurisdiction over any claims brought under Tennessee law, pursuant to 28 U.S.C. §1367, as such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the Constitution.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as all incidents, events, and occurrences giving rise to the action occurred in Cocke County, within the Northeastern Division of the Eastern District of Tennessee.

## III. PARTIES

### A.     Plaintiff

17.     Plaintiffs Troy J. Fox and Jeanene Fox are citizens of Cocke County. They are the parents of Whitney Leanne Fox, deceased. Whitney Leanne Fox was unmarried at the time of her death. She was, however, survived by her children, including her minor daughter, Ryleigh Fox, now two years old.

18.     On August 11, 2023, on petition of the Plaintiffs, the Cocke County Juvenile Court awarded custody of two-year old Ryleigh Fox to Troy and Jeanene Fox, her maternal grandparents.

-6-

Accordingly, Plaintiffs are the maternal grandparents, legal custodians, and guardians of Ryleigh Fox, a beneficiary of this proceeding.

**B.    Defendants**

19.    Cocke County, Tennessee ("the County") is a governmental entity and political subdivision of the State of Tennessee, duly organized. The County, as a local government, is a public entity in accordance with 42 U.S.C. § 12131(1) and 42 U.S.C. § 12111(5). The County, upon information and belief, is also a recipient of federal financial assistance as required under 29 U.S.C. § 794.

20.    The County possesses the power and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control, employment, assignment and removal of individual members of the Cocke County Sheriff's Office ("CCSO"), and to assure that said actions, policies, rules, regulations, practices and procedures of the CCSO and its employees and agents comply with the laws and constitutions of the United States and of the State of Tennessee.

21.    The County and the Sheriff's Office are answerable for the safekeeping of persons in their custody and responsible for all matters relating to the selection, supervision, promotion, training, and discipline of employees, including uniformed and non-uniformed employees.

22.    At all times relevant to this Complaint, Sheriff CJ Ball ("Sheriff Ball") was the duly-elected Sheriff of Cocke County, and was statutorily responsible for the screening, hiring, firing, training and the supervision of Sheriff's Office personnel; and responsible for the safety and welfare of those in his custody. Sheriff Ball was operating under color of law. He was a "policymaker" within the meaning of that term as applied by the Supreme Court in *Pembauer v. City of Cincinnati*,

-7-

479 U.S. 469 (1986), and as the official head of a "public entity" providing services, programs, or activities.

23.    The County may be served through its chief executive officer, County Mayor Rob Mathis, at the Cocke County Courthouse, 360 East Main Street, Newport, TN 37821.

24.    The Town of Parrottsville ("Parrottsville") is a governmental entity and political subdivision of the State of Tennessee, duly organized. Parrottsville is a small town in northeastern Cocke County. As of the 2020 United States census, the population of Parrottsville was 217. The Town of Parrottsville and the Parrottsville Police Department ("PPD") are responsible for all matters relating to the selection, supervision, promotion, training, and discipline of employees, including uniformed and non-uniformed employees. Parrottsville may be served through its chief executive officer, Mayor Gayla Ann Hommel, c/o Jeffrey S. Greene, Town Attorney, McSween, McSween & Greene, PLLC, 321 E. Broadway St., Newport, TN 37821.

25.    At all relevant times, Chief Derek Wright was the duly-appointed Chief of Police for the Town of Parrottsville, responsible for the screening, hiring, firing, training and the supervision of Parrottsville officers. At all relevant times, Chief Wright was operating under color of law. He was a "policymaker" within the meaning of that term as applied by the Supreme Court in *Pembauer v. City of Cincinnati*, 479 U.S. 469 (1986), and as the official head of a "public entity" providing services, programs, or activities.

26.    At all times relevant to this Complaint, Defendant, Officer Rodney Hazelwood ("Officer Hazelwood"), 31 years old, was employed by the Parrottsville Police Department )"PPD").[3] and is also a state actor under § 1983. He was operating under color of law. Officer

_____

[3]In addition to being a part-time officer with the Town of Parrottsville police department, Officer Hazelwood is also a CCSO deputy.

-8-

Hazelwood is, upon information and belief, a citizen and resident of Cocke County and may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

27.     At all times relevant to this Complaint, Defendant, Lt. Maxwell Laughter ("Lt. Laughter"), was employed by the CCSO and is also a state actor under § 1983. He was operating under color of law. Lt. Laughter is, upon information and belief, a citizen and resident of Cocke County and may be served with process at the CCSO, 111 Court Avenue, Newport, Tennessee 37821.

28.     Various persons or entities not made Defendants in this lawsuit, including but not limited to County officials or CCSO officials or employees, and Parrottsville officials or PPD officials or employees, have participated with Defendants in the violations asserted in this Complaint and have performed acts and made statements in furtherance thereof. These Doe Defendants have not yet been identified with such precision that they may be named as Defendants in this suit, but may be named by amendment when known.

## IV.   FACTUAL ALLEGATIONS[4]

### A.     Ms. Fox Is Wanted On Outstanding Warrants for Drug Charges, Failure to Appear, and a Probation Violation.

29.     On May 23, 2023, 36-year old Whitney Fox, mother of two-year old Ryleigh Fox, was wanted on a warrant issued by the Circuit Court for Cocke County in September 2022 for a drug charge, failure to appear on the drug charge, and a probation violation. Once apprehended, Ms. Fox was to be held without bond.

_____

[4]These allegations are derived from multiple sources, including DA Pro Tem Kevin Allen's memorandum, Knox County Medical Examiner's records, recordings from Officer Hazelwood's body-cam relative to the fatal shooting incident, limited scene photographs, court records, interviews of Ms. Fox's family, Ms. Fox's criminal history, communications between Ms. Fox's counsel and DA Allen, and numerous print, broadcast, and social media reports.

30.     According to CCSO Lt. Maxwell ("Max") Laughter ("Lt. Laughter"),[5] on May 23, 2023, he had been searching for Ms. Fox because she had outstanding warrants and was also allegedly "wanted for questioning" by federal authorities regarding a drug conspiracy case and her indictment thereof was imminent. Lt. Laughter called Ms. Fox a "frequent flyer," as he had dealt with her in the past.

31.     At about 4:48 p.m., on May 23, 2023, Lt. Laughter and Parrottsville Officer Rodney Hazelwood ("Officer Hazelwood") were sitting in their respective vehicles at North Highway 340 @ the Newport Utilities Substation after having unsuccessfully searched for Ms. Fox.

32.     Lt. Laughter was wearing plain clothes with a CCSO identification badge on a lanyard around his neck and driving a white unmarked Ford Expedition duty vehicle equipped with siren and emergency blue lights. Officer Hazelwood was working in uniform on this day as a part-time officer with the Parrottsville Police Department ("PPD") and driving a fully-marked Parrottsville 2012 Dodge Charger police cruiser.[6]

33.     Officer Hazelwood stated in a post-incident interview that the officers had been working a BOLO earlier that day for Ms. Fox, explaining that "county narcotics" officers were "looking for her in the area." The officers sat in their vehicles, side by side, on their phones. By now, the search for Ms. Fox had purportedly been "called off."

---

[5]Laughter was 31 years old at the time of the incident. He was hired by the CCSO on July 18, 2013. Laughter is assigned to the narcotics division of the CCSO.

[6]Hazelwood is a full-time deputy for the CCSO, but, at this particular time, he was working as a part-time police officer with the PPD. Hazelwood stated that he was hired as a corrections officer by the CCSO and worked there from 2010 to 2015. He was also an E-911 dispatcher for five years. He was hired again by the CCSO in August 2020 and started working as a patrol officer for the CCSO in March 2023, two months before the incident.

-10-

**B.      The Officers Decide Not to Apprehend Ms. Fox at the Gas Station**.

34.      In a post-incident interview, Lt. Laughter recalled that it was at that moment that he observed Ms. Fox driving a 2007 Cadillac Escalade along Highway 321. Laughter stated that Ms. Fox "was  known to him" and that the Escalade was also "known to him."

35.      According to Laughter, in their separate vehicles, the officers followed the Escalade a short distance to a gas station at Old Parrottsville Highway and North 340, called "Parrot's Place," where she pulled up to the pumps. However, as the officers approached in their vehicles, Ms. Fox "circled the gas pumps twice, then pulled away" onto the road. No explanation has been given by the officers as to why they did not simply wait for Ms. Fox to stop and exit the Escalade at the gas station.[7] But seeing the officers approach in their vehicles appears to have prompted her to pull back out on the road.

**C.      The Chase**

36.      Lt. Laughter stated that when the Escalade pulled away from the gas station, Officer Hazelwood turned on his lights and siren and got behind it. Laughter followed. The plan, Laughter explained, was to stop Ms. Fox and arrest her on the outstanding process, but Ms. Fox "did not stop and continued to drive." Both officers gave chase.

37.      For about the next ten minutes, Officer Hazelwood followed the Escalade, his body-camera activated and depicting only part of what can be seen out of the upper portion of his vehicle's windows. [Video, 16:48 to 16:57:52]. The video begins at 16:48:30, as Hazelwood's lights and sirens engaged.

---

[7]Even Officer Hazelwood told a CCSO sergeant, "my God, man . . .  Should have just tried to block her in at the store . . . ."

-11-

38.     Officer Hazelwood radioed Lt. Laughter along the way to apprize him of roads and his location, as Laughter was not close enough to Hazelwood to see him. Until Ms. Fox pulls the Escalade off the road, the Escalade cannot be seen in the body-cam video.

**D.      Ms. Fox Pulls Off Into a Field**

39.     The critical part of the video begins as Officer Hazelwood follows the Escalade to Marshall Hollow Road where it intersects with Fox Hollow Road in the Bybee community.[8] At 16:57:11, body-cam video indicates that Hazelwood's vehicle has come upon rougher terrain. A second later, Hazelwood radios to Lt. Laughter that the Escalade is "going through a field."

40.     At 16:57:44, Officer Hazelwood radios,  "she's spinning out here." Two seconds later, he reports that "she stopped." At 16:57:48-49, Hazelwood radios, "she slammed into my car." Importantly, none of this – Ms. Fox "spinning out," stopping, or "slamming" into Hazelwood's car – is seen on Hazelwood's body-cam video. Rather, it is simply his narration of what is purportedly happening at the time. Ms. Fox is not alive to give her version of the incident.

**E.      The Officers Block Ms. Fox's Exit**

41.     Following the incident, Lt. Laughter stated that he and Officer Hazelwood had blocked Ms. Fox's path to get back on the road and that this is what prompted Ms. Fox to "ram" Hazelwood's patrol car.

---

[8]As a Parrottsville Police Officer, Hazelwood had no jurisdiction in Bybee, Tennessee, where the fatal shooting occurred, as Bybee is located over five miles from Parrottsville. Tenn. Code Ann. § 6-54-301.

-12-

42.     Officer Hazelwood also states that he and Lt. Laughter blocked Ms. Fox from making an exit. But while all the vehicles sustained damage, there is no video corroborating Hazelwood or Laughter's claim that Ms. Fox intentionally "rammed" their vehicles. Certainly, Laughter admits that he intentionally rammed the Escalade to stop it and block it in.

### F.     The Officers Exit Their Vehicles

43.     The critical moment was when the officers made the decision to exit the safety of their patrol vehicles and proceed into the open field to confront Ms. Fox on foot. [Video, at 16:58:20]. As the officers had blocked Ms. Fox in, all they had to do was move to cover in order to gain and maintain a superior tactical advantage and maximize officer and public safety while, at the same time, minimizing the need for deadly or potentially deadly force. They did not do this. Like the decision not to block Ms. Fox in at the gas station or wait for her to exit the vehicle there before approaching her, they exited their vehicles in the open field.

44.     At 16:57:51, Officer Hazelwood exited his vehicle and made his way toward the Escalade, having unholstered his gun and holding it in his left hand.[9]

45.     At 16:57:55, Lt. Laughter's Expedition rams the passenger-side front of the Escalade to stop it or to block Ms. Fox's path out of the field.

46.     Lt. Laughter rammed Ms. Fox without concern for any innocent occupants of the Escalade. For example, Ms. Fox had a two-year old child. Since Laughter stated that Ms. Fox was known to him, it would have been reasonable for the officers to have assumed that Ms. Fox's two-year old daughter was in the backseat of the Escalade. The officers' actions – giving no concern to

---

[9]Officer Hazelwood's siren is blaring throughout this part of the video, making it difficult to hear the officers commands, and making it nearly impossible to hear Ms. Fox as she tries to respond.

-13-

avoiding unnecessarily endangering innocent persons who may have been inside the vehicle – demonstrates the callousness, impropriety, and recklessness of their overall actions.

**G.    The Officers Approach the Escalade with Guns Drawn and Aimed at Ms. Fox**

47.    From 16:57:54 to 16:58:00, Officer Hazelwood, who has made it over to the passenger side of the Escalade, yells at Ms. Fox to "get out of the car" and "stop that car now," as the Escalade rolled slowly backward, then slightly forward, and possibly brushed by the left front end of Hazelwood's patrol car. Lt. Laughter's Expedition is in front of Ms. Fox and Hazelwood's patrol car is to the rear passenger side of the Escalade.

48.    Officer Hazelwood ran toward the Escalade just as Ms. Fox was backing away from Lt. Laughter's Expedition, then moving forward, immediately after Laughter had rammed the front of the Escalade. By 16:58:03, the Escalade stopped and Hazelwood was positioned on the passenger side, gun drawn, screaming at Ms. Fox to "stop" and "get out now."

49.    At 16:58:05, Officer Hazelwood bangs on the passenger-side window and, while there appears to be no visible movement by the Escalade, repeatedly orders Ms. Fox to "stop."

**H.    Officer Hazelwood Screams Conflicting Commands at Ms. Fox**

50.    At 16:58:09, Officer Hazelwood approaches the passenger-side door, reaches for and grabs the passenger-side door handle to open it, but it is locked. All the windows were closed. At 16:58:15, Hazelwood backs away, yells at Ms. Fox to "get out now," then begins to walk toward the front of the Escalade, then over to the driver-side, all while pointing his gun at Ms. Fox, who sits

-14-

unarmed inside the Escalade. As Hazelwood does so, Ms. Fox tries to say something to him, but Hazelwood continues to scream at her, walks directly in the path of the Escalade, and walks around to the driver's side.

51.     By 16:58:20 of the video, Officer Hazelwood is at the driver's side front of the Escalade, while Lt. Laughter has gotten out of his vehicle and can be seen approaching the Escalade's passenger-side, gun drawn and leveled at Ms. Fox inside the Escalade.

52.     At or about 16:58:22, as Officer Hazelwood stands several feet away from the driver's side of the Escalade, and not in its path, the vehicle slowly rolls backward.

53.     Beginning at 16:58:25, Officer Hazelwood again approaches the Escalade and grabs for the driver's side door handle to open the door. That door is also locked. He tries again to open the driver's side door, but it is still locked.

I.     **Ms. Fox Slowly Backs Away From the Officers as Officer Hazelwood Threatens to Shoot Ms. Fox**

54.     At 16:58:29, the Escalade slowly *backs away from the officers*. By 16:58:34, according to DA Allen's own time-line, the Escalade is stopped. From 16:58:35 to 16:58:40, Officer Hazelwood repeatedly shouts, "stop or I'm gonna shoot you." Yet, neither Hazelwood nor Lt. Laughter is in the path of the Escalade, which is stopped or barely rolling. Hazelwood is several feet away from the driver's side door. Laughter is on the passenger-side of the Escalade and about fifteen feet away from the vehicle.

55.     Over the next several seconds, at about 16:58:41-45 on the video, Officer Hazelwood again unsuccessfully tries to open the driver's side door and repeatedly tells Ms. Fox to "get out" and "open the door." It appears that the Escalade stopped and not moving at this point.

-15-

56.     At 16:58:46, the Escalade inches backward, as Officer Hazelwood is a couple of steps away from the driver's side door and adjacent to it (*i.e.*, not in the path of the Escalade). Meanwhile, Lt. Laughter remains in his position about fifteen feet away from the passenger-side of the vehicle.

**J.     A Terrified Ms. Fox Tells Officer Hazelwood That She Is Afraid He Will Shoot Her If She Gets Out.**

57.     From 16:58:48 to 16:58:51, Ms. Fox appears to say something in response to Officer Hazelwood, who is outside the driver's side door. Whatever she said is inaudible, but she is clearly trying to communicate to Hazelwood, as he tries to break open driver's side window with a ammunition clip. Hazelwood says "get out of the God-damned car" and "open the door." Sounding panicked and terrified, throwing her hands up and looking at them, Ms. Fox appears to say, "I can't. I can't open the door" and then "I'm afraid you're going to shoot me."[10] Unmoved, Hazelwood continues to bang on the driver's side window with the magazine clip and scream conflicting commands like "open the door," "stop," and "get out of the car," at Ms. Fox.

**K.     Ms. Fox Slowly Backs Away from the Officers**

58.     In DA Allen's time-line, he claims that at 16:58:53, Ms. Fox "abruptly reverses with wheels canted, nearly striking Hazelwood." While the Escalade's left front tire turns hard to the right, Hazelwood is not in the Escalade's path. In fact, at 16:58:51-53, as the Escalade slowly moves backwards, Officer Hazelwood stopped banging on the Escalade's window and walked to the front of the Escalade, getting  directly ahead of it. He stops about twenty feet away from the Escalade.

---

[10]Notably, neither the officers nor DA Allen (nor for that matter, the TBI), indicates what Ms. Fox said to Officer Hazelwood, either as he walked in front of the Escalade to go to the driver's side or, for that matter, as he stood with his hand on the driver's side door-handle screaming at her to "stop" or "get out."

-16-

### L. Both Officers Open Fire As the Escalade Sits Running, But Stopped, Shooting Ms. Fox Thirteen Times, and Killing Her

59. At 16:58:54, as the Escalade was stopped, or at most, still inching backward *away from the officers*, both officers opened fire on Ms. Fox, killing her in a barrage of twenty-two bullets.

60. Lt. Laughter later stated that Ms. Fox had "refused commands," had "dropped" the Escalade into drive, and "trie[d] to hit [Officer Hazelwood]." Laughter specifically stated that he had observed Ms. Fox shift the Escalade into drive, then drive forward attempting to strike Officer Hazelwood. It was at that moment, Laughter says, that he opened fire through the windshield.

61. Lt. Laughter's justification for shooting Ms. Fox was therefore that he "felt [Hazelwood]'s life was in danger" and that the "only course of action was to 'stop the threat.'" So, Laughter "fired until the magazine ran out." Yet, there is no indication that Ms. Fox ever drove forward toward Officer Hazelwood. The vehicle had actually moved *away from both officers* and had then come to rest. It was not moving. And Hazelwood, who had inexplicably removed himself from safety and re-positioned himself directly in front of the Escalade, was not in imminent danger of a non-moving vehicle that had backed away from him.

62. Besides, Officer Hazelwood was able to control where he was located in relation to the Escalade, moving freely and quickly at will, from one side to the next and then to the front, and the officers also had time to try and disable the Escalade. Of course, even when the Escalade was moving, it was moving so slowly (whenever it did move) that the officers could have easily moved out of its path, just as Hazelwood did when he moved away from the driver's side door.

-17-

63.     Although DA Allen claims that the video shows the Escalade being "placed in drive and moving forward towards Hazelwood,"[11] the video actually indicates that the Escalade did not start moving forward until *after the first shot was fired* at Ms. Fox.

64.     By 16:58:58, twenty-two shots had been fired at Ms. Fox. Thirteen had hit her.[12] Only then did the officers stop firing. At 16:58:59, the Escalade, having rolled forward a few feet into a ditch,  came to rest.

65.     The officers approached the Escalade, Lt. Laughter broke out the passenger window, looked inside, saw that one or bullets had hit Ms. Fox in the head, and "knew no aid would help."

**M.     Neither Officer Attempted to De-Escalate the Traffic Stop Before Opening Fire on Ms. Fox.**

66.     The video of the incident shows that neither officer made an effort to de-escalate the situation. Rather, they approached Ms. Fox in the Escalade with weapons drawn and aimed at her, screaming they were going to shoot her, as if she was armed, as Officer Hazelwood began issuing conflicting orders directing Ms. Fox simultaneously to "stop," "get out," and other contradictory commands and then ignored her pleas from inside the cabin.

67.     Make no mistake, it was eminently foreseeable that an encounter with a civilian by two policemen with weapons drawn and ready to fire might result in a discharge of the firearms and an injury or death to the civilian. No matter whose bullet ultimately inflicted the mortal wound on Ms. Fox, the deprivation of her constitutional rights was the result of a joint effort. The officers

---

[11]The model policy on the use of force for police advises against discharging firearms at moving vehicles.

[12]According to DA Allen's memorandum, the audio track of the body-cam video appears to capture a firearm discharging 22 times. This is consistent with shell casings recovered at the scene.

-18-

exited their vehicles with guns drawn. As Ms. Fox sat unarmed in a non-moving vehicle, the officers fired twenty-two shots at her, hitting her with thirteen.

**N.      Ms. Fox Died of "Gunshots to Head"**

68.      According to Ms. Fox's death certificate, she died from "gunshot wounds of head." The autopsy report stated that she had "sustained thirteen (13) total gunshot wound entrances to her head, right upper extremities, etc." Nine bullets or bullet fragments or jackets were recovered from Ms. Fox's body, five attributable and linked to the firearm carried by Lt. Laughter. "This resulted in severe injury of the brain, leading to her death. The cause of death was determined to be those multiple gunshot wounds of the head, and the manner of death was homicide."

69.      Toxicology results showed that Ms. Fox had methamphetamine in her system. Of course, neither officer could have known this at the time of the incident. Thus, it can hardly factor in to their force-decisions. To the extent DA Allen factored Ms. Fox's post-mortem toxicology results into the reasonableness of the officers' actions, that too was improper.

**O.      DA Pro Tem Allen Exonerates Lt. Laughter and Officer Hazelwood for Fatally Shooting Ms. Fox.**

70.      Neither officer was charged. Following Ms. Fox's death, the Tennessee Bureau of Investigation ("TBI") compiled evidence and reviewed the shooting. On August 23, 2023, Carter S. Moore, Judge of the Fourth Judicial District, appointed Kevin Allen to be District Attorney Pro Tem to review the evidence gathered by the TBI and determine the propriety of criminal charges as to Lt. Laughter and Officer Hazelwood. On November 2, 2023, Allen issued his findings, closing the investigation as a justifiable homicide and declining prosecution.

71.      Allen determined that the officers had "acted in self-defense because they had a reasonable belief that Fox posted a threat of imminent death or serious bodily injury." Curiously,

-19-

in deciding not to prosecute Lt. Laughter and Officer Hazelwood, Allen focused on Hazelwood's body-cam video, "coupled with the fact that [Ms. Fox] was a wanted person, in addition to the blood results indicating that she was highly intoxicated on methamphetamine . . . ." Of course, as noted above, neither officer had any knowledge that Ms. Fox was under the influence, much less of her toxicology results.

72.     Allen also refers to the fact that Ms. Fox had outstanding warrants for failure to appear, drug offenses, and a probation violation. But those facts, even when combined with the allegedly "high speed chase" hardly gave the officers a license to shoot and kill Ms. Fox. Allen also relied upon the Escalade having "made contact with" the officers' vehicles; yet, while it is not disputed that the officers' vehicles collided with the Escalade, these collisions are not seen on Officer Hazelwood's video and the officers were out of their vehicles when they shot and killed Ms. Fox. Lt. Laughter also stated that he rammed Ms. Fox. Nothing on the video shows Ms. Fox colliding with Laughter's Expedition.

73.     In the end, Allen's decision not to prosecute the officers was largely premised on his conclusion that Ms. Fox placed the officers in danger when she "continued to operate" the Escalade in an unsafe manner. This is contradicted by the video.

74.     Having made the poor decision to flee, Ms. Fox was confronted by two gun-wielding men, one in plain clothes, the other in uniform, who approached her with guns aimed directly at her,

-20-

Officer Hazelwood's often a foot or so away from her face, screaming at her to "get out" and to "stop." At most, the unarmed Ms. Fox,[13] whose voice reflects that she was terrified, was merely panicking and trying to flee, not hurt anyone.

75.     Contrary to the officers and DA Allen's claims, Ms. Fox did not attempt to "hit" the officers once they approached her on foot. Rather, her actions were slow and deliberate, such that neither officer was in danger of being "hit." Although Ms. Fox was operating a large SUV which could naturally serve as a dangerous "weapon," once the officers exited their vehicles and approached the Escalade, she did not threaten their lives with it.

76.     Also contrary to DA Allen's findings, once Officer Hazelwood exited his vehicle, approached the Escalade, and began commanding Ms. Fox to "get out" and "stop," the video demonstrates that he was not at risk of being struck by the Escalade. While DA Allen states that Lt. Laughter "began firing from his passenger side position at some point during this backward sweeping act," the video contradicts this claim, as it shows Laughter and Hazelwood both firing at Ms. Fox as the Escalade is stopped, or at most, as it inched backwards. Only then, after several shots are fired into the Escalade's cabin, does the vehicle then slowly move forward a few feet, coming to a stop in a ditch.

**P.     Ms. Fox Was Not an Imminent Threat to the Officers at the Time They Shot and Killed Her.**

77.     The exoneration of Officer Hazelwood and Lt. Laughter by DA Pro Tem Allen largely hinged on speculation about the alleged threat posed by Ms. Fox, rather than the actual evidence. That speculation led Allen astray from the relevant and more narrow question at stake:

---

[13]Nothing in DA Allen's memorandum, the incident report, or the record made available to the Plaintiffs indicates that either officer believed Ms. Fox was armed at any point during the incident.

-21-

whether the officers had probable cause to believe Ms. Fox posed an imminent serious physical threat when they opened fire and killed her.

78. Officer Hazelwood's body-cam video indicates that neither officer was in imminent danger from Ms. Fox when they fired, hitting Ms. Fox thirteen (13) times, as she sat in the not-moving Escalade, mortally wounding her. At that moment, Lt. Laughter was standing on the passenger's side of the Escalade, approximately fifteen (15) feet away, with his arm and weapon extended toward the driver's seat – where Ms. Fox sat. At the same time, Officer Hazelwood – who had maneuvered himself from the driver's side of the Escalade to a position in front of the vehicle – was about twenty (20) feet in front of the Escalade.

79. In the three seconds preceding the fatal shooting, Ms. Fox had slowly moved the Escalade in reverse *away from* Officer Hazelwood's position, not toward him, and certainly not toward Lt. Laughter. The distance between Ms. Fox and Hazelwood had only increased as she backed away from him. At that moment, neither Ms. Fox nor the Escalade posed a serious threat to either officer.

## V. WAIVER OF IMMUNITY

80. The County has waived immunity for their negligence and the negligence of their employees, misconduct of deputies acting under color of law, and for the negligence of deputies or employees of the County, as set out in Tenn. Code Ann. §29-20-305, and for intentional acts or misconduct done by deputies under color of law, as set out in Tenn. Code Ann. §8-8-302-302.

81. There is no immunity for individuals for criminal conduct, or conduct which is willful or malicious.

-22-

## VI.  CLAIMS FOR RELIEF

## COUNT ONE

## VIOLATION OF 42 U.S.C. § 1983
## EXCESSIVE FORCE UNDER THE FOURTH AMENDMENT
## TO THE UNITED STATES CONSTITUTION

### (Against Lt. Laughter and Officer Hazelwood, Individually)

82.     Plaintiffs incorporate by reference the allegations in Paragraph Nos. 1-81, as if fully set forth herein verbatim.

83.     Under 42 U.S.C. § 1983, a person has a federal cause of action for money damages against an individual acting under color of state law who deprives another of rights, privileges, or immunities secured by the United States Constitution and federal laws. Here, Lt. Laughter and Officer Hazelwood were acting under color of state law.

84.     Nearly any suspect fleeing in a motor vehicle poses some threat of harm to the public. The real inquiry is whether the fleeing suspect posed such a threat that the use of deadly force was justifiable. Here, Lt. Laughter and Officer Hazelwood used excessive force when they shot and killed Ms. Fox while she was sitting in a non-moving (or at most, barely moving) vehicle. Their unjustified shooting deprived Ms. Fox of her fundamental interest in life and her right to be secure in her person against unreasonable seizures, as guaranteed to her under the Fourth Amendment to the United States Constitution, as applied to state actors by the Fourteenth Amendment.

85.     The key to evaluating whether a seizure violated the Fourth Amendment is reasonableness. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Here, the officers shot Ms. Fox without a reasonable belief that she posed a significant threat of death or serious physical injury to them or others. As a result, their actions were legally unreasonable under the Fourth Amendment.

-23-

86.     Ms. Fox was not, by any reasonable account, operating the Escalade in a hostile or threatening manner, and at no point after the officers exited their vehicles was either officer's life in danger. If the Escalade never moved toward either officer, but only moved *away from* them, or inched backwards or forward, but not toward the officers, it could not have posed an immediate threat to the officers. Neither officer was injured during the incident.

87.     Should Ms. Fox have fled. Of course not. It will never be known what prompted her to flee. Perhaps, it was the methamphetamine. Perhaps, it was fear of going to jail on the probation violation and other charges. Either way, it was a poor decision on her part, one that she is not here to explain or defend, even if she could.  Still, our system of justice does not permit law enforcement officers to execute citizens for making bad decisions.

88.     This claim boils down to whether a reasonable police officer would have made similar decisions under the circumstances. Here, neither officer was in imminent danger of being harmed by Ms. Fox or the Escalade. Lt. Laughter was fifteen feet away from the Escalade on the passenger's side. Officer Hazelwood, who was opposite Laughter's position and several feet away from the Escalade on the driver's side of the Escalade, suddenly moved himself to the front of the Escalade, and stood about twenty (20) feet away from its front.

89.     The officers did not fire at Ms. Fox as the Escalade was "bearing down" on Officer Hazelwood. Rather, they fired as the Escalade sat motionless. The fact that a suspect is sitting in a car with the engine running is not, in and of itself, a sufficient reason for an officer to open fire. Lt. Laughter claims that he perceived danger for Hazelwood sufficient to justify gunfire because Ms. Fox had backed the Escalade away from and in the opposite direction from where the officers stood. To the extent Ms. Fox moved forward, that did not appear to happen until shots were fired.

-24-

90.     While a car can be a deadly weapon, to justify deadly force, an officer must have a reasonable belief "that the car presents an imminent danger." Here, a reasonable officer would not have believed his or anyone else's life was imminently in danger from Ms. Fox's actions immediately preceding the moment they fired, and no reasonable officer under the circumstances would have believed that the use of deadly force against Ms. Fox was lawful. Even if some force were constitutionally reasonable, the degree of force used here – firing twenty-two (22) rounds at Ms. Fox as she sat in the Escalade – was clearly excessive and unconstitutionally disproportionate in degree to the circumstances.

91.     *Garner* "clearly establishes" the right at issue, *i.e.*, the right not to be shot unless the suspect poses an immediate threat to the officers or others. *Garner*, 471 U.S. at 11. Because neither Lt. Laughter nor Officer Hazelwood had any reason to believe that he was subject to immediate risk of death or serious danger, this is a case of a violation of a clearly established right under *Garner*.

92.     It was clearly established, at the time of Ms. Fox's death, that an officer may not use potentially deadly force to effectuate an arrest in the absence of any reasonably perceived threat of death or serious physical injury to the acting officer or others.

93.     The officers' actions, including their unreasonable and unjustified use of deadly force against Ms. Fox, proximately caused her death. Their actions and omissions also deprived Ms. Fox of her fundamental interest in life, in violation of the United States Constitution. As a result, the officers are liable for Ms. Fox's death.

94.     Specifically, Lt. Laughter and Officer Hazelwood's violations of Ms. Fox's Fourth Amendment rights directly and proximately caused Ms. Fox to suffer (a) excruciating physical pain and suffering before her death; (b) severe emotional suffering and mental anguish, despair, and

-25-

hopelessness before her death; (c) lost earnings and/or loss of earning capacity in the future based on the probable duration of her life, if her death had not occurred; (d) loss of the enjoyment of the remainder of the probable duration of her life if her death had not occurred; (e) funeral and burial expenses, all of which are recoverable by Plaintiffs; and (f) the loss of society and companionship for Ms. Fox's minor daughter.

95.      Furthermore, the conduct of Lt. Laughter and Officer Hazelwood was also willful, wanton, malicious, deliberately indifferent, and done with reckless disregard for Ms. Fox's federally-protected rights, justifying an award of punitive damages so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct. and therefore warrants the imposition of exemplary and punitive damages.

96.      Plaintiffs sue the officers for their violation of Ms. Fox's constitutional rights, and seek any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

**COUNT TWO**

**VIOLATION OF 42 U.S.C. § 1983**
**FAILURE TO TRAIN UNDER THE FOURTEENTH AMENDMENT**
**TO THE UNITED STATES CONSTITUTION**
**(MUNICIPAL LIABILITY)**

**(Against Cocke County)**

97.      Plaintiffs incorporate by reference the allegations in Paragraph Nos. 1-96, as if fully set forth herein verbatim.

-26-

98.     As Sheriff of Cocke County, Sheriff Ball has final authority and makes policy for the CCSO in establishing and implementing policies and/or procedures with respect to the use of force by police against citizens (including both less-lethal and deadly force), as well, as the legal limits of such activities, for police officers employed by the CCSO.

99.     Here, the unconstitutional consequences of failing to train officers in the reasonable and justifiable use of deadly force are so patently obvious that Cocke County is liable under § 1983. Lt. Laughter's actions demonstrate such obvious and egregious training deficiencies to make the CCSO's use-of-force training constitutionally defective.

100.    As final policymaker for the CCSO, Sheriff Ball established, implemented, or continued policies and procedures regarding the use of force by CCSO officers against citizens (including deadly force), which policies and procedures themselves violate federal constitutional law.

102.    Even if the policies and procedures regarding the use of force against citizens (including deadly force) do not themselves violate federal law, there is and was – at the time of the deadly encounter between Lt. Laughter and Ms. Fox – a persistent and widespread practice among CCSO officers of using excessive and/or deadly force on a subject when it is unnecessary and objectively unreasonable as a matter of law to do so, amounting to a custom or course of conduct so widespread as to become informal CCSO policy, acquiring the force of law.

103.    Even if the formal policies and procedures of the CCSO are not themselves unlawful, alternatively, the operation of such policies and procedures "on the street" reflects a standard operating procedure of CCSO officers violating citizens' federally-protected rights as identified herein.

-27-

104.     At all times material to this complaint, Sheriff Ball and the County have known or have had constructive knowledge of this practice, but have refused or failed to take measures reasonably necessary to prevent or minimize such violations.

105.     The response by Sheriff Ball and the County to this practice of constitutional violations has been inadequate.  These include but are not limited to:

   ■ the lack of or inadequate training regarding the legal limitations on the permissible use of force, both less-lethal and deadly force; and

   ■ the lack of or inadequate discipline of individual officers found to have committed unlawful uses of force.

106.     Violations of citizens' constitutional rights of the type inflicted on Ms. Fox, specifically including the use of deadly force, are the known or obvious consequences either of formal County or CCSO policies and procedures that themselves violate federal law, or of a practice and custom of such violations in which Sheriff Ball and the County have acquiesced or tacitly authorized. These actions reflect deliberate indifference on the part of Sheriff Ball and the County to such known or obvious consequences of their actions and omissions, as resulted in the deprivation of Ms. Fox's federally-protected rights.

107.     Such practices were the moving force behind – and directly and proximately caused – the violations of Ms. Fox's rights and her death; and render the County liable for the causal connection between this deliberate indifference and Lt. Laughter's violations of Ms. Fox's rights, and/or the County's custom or practice of constitutional violations that proximately resulted in the violation of Ms. Fox's rights.

108.     The County, CCSO, and Sheriff Ball failed to train and supervise officers or employees to avoid the use of deadly force.

-28-

109.     The County, CCSO, and Sheriff Ball had a duty of care to Ms. Fox to ensure that their officers were properly trained in the appropriate procedure for using deadly force. This duty extends to ensuring that CCSO officers were properly trained concerning the limits of their authority to use deadly force.

110.     Here, traffic stops on suspects with outstanding warrants are a frequent part of daily shifts. Officers must have specific training to be equipped to properly react to recurring situations, such as the one presented, without unnecessarily escalating them.

111.     In this case, Lt. Laughter lacked the tools the County, CCSO, and Sheriff Ball should have provided him to allow him to safely handle the situation. Consequently, Lt. Laughter wound up unnecessarily escalating the level of force and needlessly causing Ms. Fox's death, over what began as a routine investigation of a misdemeanor traffic offense.

112.     The County, CCSO, and Sheriff Ball's failure to develop and promulgate lawful policies outlining the guidelines for such situations and the appropriate use-of-force and to properly train its officers and supervisors to follow such guidelines constitute deliberate indifference to the constitutional rights of citizens.

113.     As a direct and proximate result of the actions and omissions of the County, CCSO, and Sheriff Ball causing the violation of his Fourth Amendment rights, Ms. Fox suffered (a) excruciating physical pain and suffering before her death; (b) severe emotional suffering and mental anguish, despair, and hopelessness before her death; (c) lost earnings and/or loss of earning capacity in the future based on the probable duration of her life if her death had not occurred; (d) loss of the

-29-

enjoyment of the remainder of the probable duration of her life if her death had not occurred; (e) funeral and burial expenses, all of which are recoverable by Plaintiffs; and (f) the loss of society and companionship for Ms. Fox's minor daughter.

114.     Plaintiffs sue the County for violating Ms. Fox's constitutional rights, and seek any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

### COUNT THREE

### VIOLATION OF 42 U.S.C. § 1983
### FAILURE TO TRAIN UNDER THE FOURTEENTH AMENDMENT
### TO THE UNITED STATES CONSTITUTION
### (MUNICIPAL LIABILITY)

### (Against Town of Parrottsville)

115.     Plaintiffs incorporate by reference the allegations in Paragraph Nos. 1-114, as if fully set forth herein verbatim.

116.     As Chief of Police of Parrottsville, Chief Wright has final authority and makes policy for the Parrottsville Police Department ("PPD") in establishing and implementing policies and/or procedures with respect to the use of force by police against citizens (including both less-lethal and deadly force), as well, as the legal limits of such activities, for police officers employed by the PPD.

117.     Here, the unconstitutional consequences of failing to train officers in the reasonable and justifiable use of deadly force are so patently obvious that Parrottsville and Chief Wright are liable under § 1983. Officer Hazelwood's actions demonstrate such obvious and egregious training and supervisory deficiencies to make the PPD's use-of-force training constitutionally defective.

118.     As final policymaker for the PPD, Chief Wright established, implemented, or continued policies and procedures regarding the use of force by PPD officers against citizens

-30-

(including deadly force), which policies and procedures themselves violate federal constitutional law.

119. Even if the formal policies and procedures of the PPD are not themselves unlawful, alternatively, the operation of such policies and procedures "on the street" reflects a standard operating procedure of PPD officers violating citizens' federally-protected rights as identified herein.

120. Violations of citizens' constitutional rights of the type inflicted on Ms. Fox, specifically including the use of excessive and/or deadly force, are the known or obvious consequences of Parrottsville or PPD policies and procedures that themselves violate federal law. The actions and omissions of Chief Wright and Parrottsville, as identified herein, reflect deliberate indifference on their part to such known or obvious consequences of their actions and omissions, as resulted in the deprivation of Ms. Fox's federally-protected rights.

121. Such practices were the moving force behind – and directly and proximately caused – the violations of Ms. Fox's rights and her death; and render Parrottsville liable for the causal connection between this deliberate indifference and Officer Hazelwood's violations of Ms. Fox's rights, and/or the PPD's custom or practice of constitutional violations that proximately resulted in the violation of Ms. Fox's rights.

122. Parrottsville, the PPD, and Chief Wright failed to train and supervise officers or employees to avoid the use of deadly force.

123. Parrottsville, the PPD, and Chief Wright had a duty of care to Ms. Fox to ensure that officers were properly trained in the appropriate procedure for using deadly force. This duty extends to ensuring that officers were properly trained concerning the limits of such authority.

-31-

124.     Parrottsville, the PPD, and Chief Wright also had a duty to properly supervise their officers. This is especially true when there is (a) a "likelihood that [a] situation will recur" (b) with such a "high degree of predictability" that "an officer lacking specific tools to handle that situation will violate citizens' rights." Here, traffic stops on suspects with outstanding warrants are a frequent part of daily shifts. Officers must have specific training to be equipped to properly react to recurring situations, such as the one presented, without unnecessarily escalating them.

125.     In this case, Officer Hazelwood lacked the tools Parrottsville, the PPD, and Chief Wright should have provided him to allow him to safely handle the situation that confronted him. Consequently, Hazelwood wound up unnecessarily escalating the level of force and needlessly causing Ms. Fox's death, over what began as a routine investigation of a misdemeanor traffic offense.

126.     Parrottsville, the PPO, and Chief Wright's failure to develop and promulgate lawful policies outlining the guidelines for such situations and the appropriate use-of-force and to properly train its officers and supervisors to follow such guidelines constitute deliberate indifference to the constitutional rights of citizens.

127.     As a direct and proximate result of the actions and omissions of Parrottsville, the PPD, and Chief Wright causing the violation of his Fourth Amendment rights, Ms. Fox suffered (a) excruciating physical pain and suffering before her death; (b) severe emotional suffering and mental anguish, despair, and hopelessness before her death; (c) lost earnings and/or loss of earning capacity in the future based on the probable duration of her life if her death had not occurred; (d) loss of the

-32-

enjoyment of the remainder of the probable duration of her life if her death had not occurred; (e) funeral and burial expenses, all of which are recoverable by Plaintiffs; and (f) the loss of society and companionship for Ms. Fox's minor daughter.

128.   Plaintiffs sue Parrottsville and Chief Wright for violating Ms. Fox's constitutional rights, and seek any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

**COUNT FOUR**

**BATTERY**

**(Against Cocke County, Lt. Laughter, and Officer Hazelwood)**

129.   Plaintiffs incorporate by reference the allegations in Paragraph Nos. 1-96, as if fully set forth herein.

130.   Under Tennessee law, a battery is an intentional, unlawful, and harmful or offensive physical contact with someone. Anyone hurt by a police officer can sue the county, as long as the officer was acting under color of his office. *See* Tenn. Code Ann. § 8-8-302.

131.   The above-described fatal shooting of Ms. Fox by Lt. Laughter and Officer Hazelwood, acting under color of law and in the course and scope of their employment for Cocke County and the Town of Parrottsville, respectively, was a battery against Ms. Fox.

132.   As a direct and proximate result of the actions of Lt. Laughter and Officer Hazelwood, Ms. Fox, her body riddled with thirteen bullets, including several in the head, died from her injuries. As alleged in Paragraphs 1-96 above, at the time the officers shot and killed Ms. Fox, they had no legal justification for using deadly force against her. Their use of such deadly force was unreasonable under the circumstances. As such, it was a battery under Tennessee law.

-33-

133. The foregoing acts of the Lt. Laughter and Officer Hazelwood proximately caused the fatal injuries to Ms. Fox, entitling Plaintiffs to recover compensatory damages from the Defendants for such damages. Said damages include, but are not limited to, the tremendous pain and suffering Ms. Fox suffered before her death, her loss of earnings, funeral and/or related burial expenses, and loss of society and for Ms. Fox's minor daughter.

134. Under Tenn. Code Ann. § 8-8-302, the County is also liable for the battery perpetrated on Ms. Fox by Lt. Laughter of the CCSO while acting under color of his office. An officer acts under color of his office when he acts or purports to act in an official capacity or takes advantage of such actual or purported capacity. When Laughter seized and shot Ms. Fox, as alleged in Paragraphs 1-96 above, he was at least taking advantage of his purported official capacity. Laughter was appointed to that position by the Sheriff and was acting under color of that office at the moment he shot and killed Ms. Fox.

135. The conduct of Lt. Laughter was malicious, wanton, oppressive, and accomplished with a conscious disregard for Ms. Fox's rights, entitling Plaintiffs to an award of punitive damages.

## COUNT FIVE

## NEGLIGENCE/GROSS NEGLIGENCE

### (Against All Defendants)

136. Plaintiffs incorporate by reference the allegations in Paragraph Nos. 1-96, as if fully set forth herein verbatim.

137. Having stopped Ms. Fox, Defendants had a duty to act with ordinary care and prudence so as not to cause her harm or injury.

-34-

138. The actions and inactions of Defendants were negligent and reckless, including but not limited to, the grossly negligent use of deadly force against Ms. Fox, as alleged in Paragraphs 1-96 above, which resulted in Ms. Fox's death.

139. Defendants owed a duty to the public in general and to Ms. Fox specifically to use due care in fulfilling their duties as police officers and to ensure their conduct conformed to applicable laws, policies, procedures, and generally accepted police standards. Defendants failed to use due care and were negligent, grossly negligent, reckless, willful, and wanton in all of the foregoing particulars.

140. Pursuant to the Tennessee Governmental Tort Liability Act, these Defendants also owed Ms. Fox a duty of care to protect her from injury.

141. Defendants breached those duties of care, as set forth herein.

142. As a direct and proximate result of Defendants' conduct, as alleged in Paragraphs 1-96 above, and other undiscovered negligent conduct, Ms. Fox was caused to suffer severe pain and suffering and ultimately died.

143. The foregoing acts of Lt. Laughter and Officer Hazelwood proximately caused the fatal injuries to Ms. Fox, entitling Plaintiffs to recover compensatory damages from the Defendants for such damages. Said damages include, but are not limited to, the tremendous pain and suffering Ms. Fox suffered before her death, her lost wages, funeral and/or related burial expenses, and loss of society and companionship for Ms. Fox's minor daughter.

-35-

**COUNT SIX**

**INTENTIONAL AND RECKLESS INFLICTION OF EMOTIONAL DISTRESS**

**(Against Lt. Laughter and Officer Hazelwood)**

150.    Plaintiffs incorporate by reference the allegations in Paragraph Nos. 1-96, as if fully set forth herein verbatim.

151.    The actions alleged herein against Lt. Laughter and Officer Hazelwood were outrageous and utterly intolerable in a civilized society, and were done with a reckless disregard of the probability of causing emotional distress.

152.    Specifically, the officers lacked any reasonable justification for shooting and killing Ms. Fox under the circumstances that then and there existed. Regardless of whether they may or may not have had a justification at any point *prior to* actually shooting her, they were not facing an imminent threat from Ms. Fox at the time they shot and killed her.

153.    At the time Lt. Laughter and Officer Hazelwood opened fire and riddled Ms. Fox's body with thirteen (13) bullets from twenty-two (22) shots fired, video indicates that Ms. Fox had backed the Escalade *away from* Officer Hazelwood.

154.    Insofar as the officers claim that Ms. Fox was about to use the Escalade as a "deadly weapon" against them at the moment they opened fire on her and killed her, Officer Hazelwood's body-cam video indicates that was not the case. Lt. Laughter was on the passenger side of the Escalade, about fifteen feet away from the passenger-side door, and not in the Escalade's path. Two seconds before he fired at Ms. Fox, Officer Hazelwood had been on the driver's side of the Escalade,

-36-

several feet away from the driver's side door. When the Escalade slowly inched backward, instead of taking a step or two backwards, Officer Hazelwood inexplicably walked around to the front of the Escalade, putting himself himself directly in its path.

155.    As Officer Hazelwood yelled at her and told her to get out banged on the driver' side window with his magazine clip, Ms. Fox also appeared to indicated that she could not open the Escalade's doors to get out, uttering something akin to "I can't open the door" and "I'm afraid you're going to shoot me" or words to that effect.

156.    Both officers' actions were perpetrated with reckless disregard to the consequences, failing to consider far less dangerous approaches to apprehending Ms. Fox and having not concerned themselves with the possibility of innocent occupants or even children in the Escalade before opening fire. As Plaintiffs have alleged, Ms. Fox was shot and killed without reasonable justification and her minor child left motherless.

157.    The aforementioned acts were done in reckless, wanton, and callous disregard of Ms. Fox's safety, security, and civil rights. By reason thereof, Plaintiffs claim compensatory damages of $3,500,000, as well as punitive damages of $5,000,000, sufficient to punish and deter Lt. Laughter, Officer Hazelwood and others from engaging in similar conduct in the future.

**VII. JURY DEMAND**

158.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray:

A.      That Defendants be served with a copy of this Complaint and be required to answer;

B.      That the Court find that Defendants have engaged in the unconstitutional conduct and statutory and common law violations alleged herein;

C.      That Plaintiffs recover compensatory damages in the sum of $3,500,000, as provided by federal and Tennessee law, jointly and severally, and that a judgment in his favor be entered against the Defendants in an appropriate amount as shown at trial;

D.      That alternatively, Plaintiffs be awarded such damages as will fully compensate them for all injuries proximately caused by Defendants' actions and that a judgment in their favor be entered;

E.      That Plaintiffs be awarded punitive damages in the sum of $5,000,000, or an appropriate amount sufficient to deter Defendants from engaging in similar conduct in the future;

F.      That Plaintiffs have and recover costs for this suit, including reasonable attorneys' fees and discretionary costs, as provided by law; and

G.      That Plaintiffs be awarded post-judgment interest as permitted by common law or applicable statute and such other or further relief as may be just and proper.

-38-

Respectfully submitted, this 21st day of May, 2024.

/s/ Lance K. Baker
Lance K. Baker, Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
First Horizon Plaza
800 S. Gay Street, Suite 1950
Knoxville, TN 37929
Tel: (865) 200-4117
Fax: (865) 437-3370
lance@lbakerlawfirm.com

*Counsel for Plaintiff*s

-39-