UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

TROY J FOX, *et al.*,  )
        Plaintiffs,  )
v.  )   No. 2:24-CV-00088-JRG-CRW
COCKE COUNTY, TENNESSEE, *et al.*,  )
        Defendants.  )

## MEMORANDUM OPINION AND ORDER

In this 42 U.S.C. § 1983 action, Plaintiffs Troy J. Fox and Jeanene Fox bring Fourth Amendment and related state law claims on behalf of their daughter, decedent Whitney Fox. Now before the Court are summary judgment motions filed by the defendant officers, Rodney Hazelwood and Maxwell Laughter (collectively "Defendants"). [Hazelwood Mot., Doc. 11; Laughter Mot., Doc. 27]. As discussed below, a reasonable jury could find that the officers violated Ms. Fox's constitutional rights. However, because it was not clearly established at the time that their use of force was unlawful, they are entitled to qualified immunity and their motions for summary judgment on the federal claims against them will be **GRANTED**.

### I. BACKGROUND

On the afternoon of May 23, 2023, Patrol Officer Rodney Hazelwood of the Parrottsville Police Department and Lieutenant Maxwell Laughter of the Cocke County Sheriff's Office were parked along North Highway 340 in Parrottsville, talking through the open windows of their vehicles. [Hazelwood Decl., Doc. 11-1 ¶ 5; Laughter Decl., Doc. 27-1 ¶ 5]. Hazelwood was driving a police cruiser, while Laughter was in an unmarked county vehicle. [Hazelwood Decl. ¶ 5; Laughter Decl. ¶ 5]. Their attention was drawn to a white Escalade driving at an unusually slow

1

speed. [Hazelwood Decl. ¶ 5]. Laughter recognized that the driver was Whitney Fox, who had outstanding warrants for felony drug charges, violation of probation, and failure to appear. [Allen Decl., Ex. 1, Doc. 11-2 at 7–8; Laughter Decl. ¶ 6]. She was also a person of interest in a federal drug investigation. [Hazelwood Decl. ¶ 6; Laughter Decl. ¶ 7]. The officers followed Ms. Fox to a gas station a short distance away. [Hazelwood Decl. ¶ 7; Laughter Decl. ¶ 8]. She drove twice around the pumps and accelerated back onto the road. [Hazelwood Decl. ¶ 7; Decl. Laughter ¶ 9].

The officers activated their lights and sirens, and Hazelwood gave pursuit, with Laughter following behind.[1] [Hazelwood Decl. ¶ 9; Laughter Decl. ¶¶ 10, 11]. Hazelwood also activated his body-worn camera ("BWC"), although it was positioned in such a way that it did not capture the road or any of Ms. Fox's driving. [BWC at 16:48:46–16:57:12]. According to his testimony, during the approximately ten-minute pursuit that followed, Ms. Fox drove between forty and seventy miles per hour on a state highway and country roads. [Hazelwood Decl. ¶ 10]. At one point, she turned left at an intersection, driving around another vehicle that was stopped at the stop sign. [*Id.*; Hazelwood Dep., Ex. 2, Doc. 45-1 at 81]. Then she drove in the opposing lane of a two-lane state highway, using that lane to swerve around another vehicle while driving seventy miles per hour. [Hazelwood Decl. ¶ 10; Hazelwood Dep. at 47]. Near the end of the pursuit, she reached sixty-five miles per hour on a small one-lane road that has blind curves. [Hazelwood Decl. ¶ 10].

Then Ms. Fox turned into a mown hayfield, surrounded by woods. [Laughter Dep., Doc. 45-2 at 41; BWC at 16:57:18]. The only residence nearby was an abandoned house or shed. [Laughter Dep. at 41]. Communicating over radio, the officers decided they would box Ms. Fox's vehicle into a corner of the field. [Hazelwood Decl. ¶ 12; Laughter Decl. ¶ 13]. As Ms. Fox was reversing, Hazelwood drove up behind her, and she collided with his cruiser. [Hazelwood Decl. ¶

---

[1] Laughter fell behind in the pursuit and did not see any of Ms. Fox's driving. [Laughter Decl. ¶ 11].

12]. Then Laughter attempted to block Ms. Fox's forward path. [Laughter Dep. at 39]. According to Laughter, at that point, Ms. Fox used the Escalade to ram his vehicle. [*Id.*]. However, the body camera video and a diagram from the Tennessee Bureau of Investigation ("TBI") crash report show that Laughter's vehicle struck the Escalade. [BWC at 16:57:53; Allen Decl., Ex. 1 at 21].[2] After the contact with Laughter's vehicle, Ms. Fox maneuvered backward, and in doing so, scraped Hazelwood's push bumper. [BWC at 16:57:56–16:58:06].

The officers exited their vehicles with weapons drawn. [Hazelwood Decl. ¶ 13]. Laughter positioned himself approximately fifteen to twenty feet away from the Escalade on the passenger side.[Laughter Dep. at 61; Laughter Decl. ¶ 16]. Hazelwood approached the front passenger door, shouting commands for Ms. Fox to stop and exit the vehicle. [BWC at 16:57:56–16:58:10; Laughter Decl. ¶¶ 15, 17]. It was hard to hear over the sound of the patrol car's siren, which remained activated throughout the events that followed. [Laughter Dep. at 50]. Hazelwood attempted to open the passenger door. [BWC at 16:58:11; Hazelwood Decl., ¶ 14]. Finding it locked, he moved around the front of the Escalade to the driver side, shouting commands. [BWC at 16:58:12–16:58:27; Hazelwood Decl. ¶¶ 14–15]. Hazelwood tried the driver door, which was also locked. [BWC at 16:58:26]. He could see that Ms. Fox was "throwing her hands up in some way." [Hazelwood Dep. at 62]. He could also see her lips moving but could not hear what she said. [*Id.* at 57].

Ms. Fox slowly reversed a short distance, with the wheels of the Escalade canted toward the right, i.e. toward the passenger side of the vehicle. [BWC at 16:58:29–16:58:36]. Hazelwood shouted that he would shoot her if she did not get out. [*Id.* at 16:58:36]. He began striking the

---

[2] The TBI crash report diagram shows that after the Escalade ("Unit 1") backed into Hazelwood's cruiser ("Unit 2") and pulled forward, the front of Laughter's vehicle ("Unit 3") struck the front passenger side of the Escalade. [Allen Decl., Ex. 1 at 21].

3

driver side window with an ammunition clip, in an attempt to break the glass. [*Id.* at 16:58:51; Hazelwood Decl. ¶¶ 15, 17]. As he was doing this, Ms. Fox abruptly began reversing, with the wheels canted to the right, causing Hazelwood to step back. [*Id.* at 16:58:53; Hazelwood Decl. ¶ 18]. The Escalade reversed no more than twenty feet away from Hazelwood and halted.[3] [Hazelwood Stmt. Undisp. Mat. Facts, Doc. 12 ¶ 5]. At that point, Hazelwood was directly in front of the vehicle. [BWC at 16:58:54]. However, video shows the wheels of the Escalade were canted to the right, such that Hazelwood was not in the Escalade's direct forward path.[4] [*Id.*].

Then, Laughter began firing multiple rounds through the passenger side windshield toward Ms. Fox. [Laughter Decl. ¶ 21]. The timing of when he began firing is unclear. After viewing the body-worn camera video frame by frame, Kevin Allen—the district attorney general ("DAG") appointed to evaluate the shooting for possible criminal charges against the officers—concluded that Laughter started firing from his passenger side position "at some point during [the Escalade's] backward sweeping act."[5] [Allen Decl., Ex. 1 at 15]. Laughter attests that he did not start firing until he saw Ms. Fox shift the Escalade into drive and the vehicle moved forward toward Hazelwood. [Laughter Decl. ¶¶ 19–21].

Video appears to show that the Escalade moved slowly forward on a curved path, on a trajectory leading between the officers. [BWC at 16:58:56–58]. When it had moved "somewhat," "maybe a foot," Hazelwood fired several rounds into the hood from a position in front or to the

---

[3] In his declaration, Hazelwood maintains that the Escalade was "ten to fifteen feet away," after it reversed. [Hazelwood Decl. ¶ 18]. However, since Hazelwood characterizes the distance as "no more than twenty feet away" in his statement of undisputed facts, the Court, viewing the evidence in the light most favorable to Plaintiffs, will assume the distance was approximately twenty feet.

[4] In their summary judgment memoranda, both Defendants include a still frame from the moment when Hazelwood found himself directly in front of the Escalade. [Hazelwood Mem., Doc. 13 at 8; Laughter Mem., Doc. 29 at 7]. Although difficult to discern in those images, the video itself clearly shows that the Escalade's wheels were canted to the right, not pointed straight ahead toward Hazelwood, when it halted in front of him.

[5] DAG Allen concluded that criminal charges against Hazelwood and Laughter were not warranted. [Allen Decl., Doc. 11-2 ¶ 10].

4

side of the passenger side of the windshield.[6] [Hazelwood Dep. at 65; *see* Allen Decl., Ex. 1 at 16]. As the Escalade continued to roll forward, he fired twice into the driver side of the vehicle. [*Id.* at 16:58:58]. The Escalade skirted the edge of the field and came to rest in a ditch. [*Id.* at 16:58:58–16:59:04; Laughter Decl. ¶ 22]. Laughter broke out the passenger's side window and observed that Ms. Fox had sustained a gunshot wound to her head and no amount of aid would help. [Laughter Decl. ¶ 23].

According to the autopsy report, Ms. Fox sustained thirteen gunshot wounds. [Allen Decl., Ex. 1 at 23]. Of the nine bullets recovered from her body, five were attributable to Laughter, and the others were not conclusively matched to any firearm. [*Id.* at 22–23].

Plaintiffs subsequently brought this 42 U.S.C. § 1983 action, alleging Fourth Amendment and related state law claims against Hazelwood and Laughter, as well as entity defendants, Cocke County, Tennessee ("Cocke County"), and the Town of Parrottsville, Tennessee ("Parrottsville"). Hazelwood and Laughter filed motions for summary judgment on the federal claims against them. [Hazelwood Mot.; Laughter Mot.]. In the event their motions are granted, they ask the Court to decline to exercise supplemental jurisdiction over the related state law claims and to dismiss those claims without prejudice. [Hazelwood Mot. at 2; Laughter Mot. at 1]. Plaintiffs filed a response in opposition [Pls.' Resp., Doc. 41], and Defendants replied [Hazelwood Reply, Doc. 47; Laughter Reply, Doc. 50]. This matter is ripe for review.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court determines the relevant facts and draws all inferences in favor of the non-moving party

---

[6] The TBI photo depicting the trajectory of Hazelwood's shots fired into the hood indicates that he fired on a diagonal trajectory originating from or to the side of the passenger side of the windshield. [*See* Allen Decl., Ex. 1 at 16].

5

"*to the extent supportable by the record.*" *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). If "videos in the record show facts so clearly that a reasonable jury could view those facts in only one way, those facts should be viewed in the light depicted by the videos." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citing *Harris*, 550 U.S. at 380). However, "[t]o the extent that facts shown in videos can be interpreted in multiple ways or if videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Id.* (citing *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015).

"[W]here an officer defendant is the only witness left alive to testify, the award of summary judgment to the defense in a deadly force case must be decided with particular care." *Burnette v. Gee*, 137 Fed. App'x 806, 809 (6th Cir.2005) (citing *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994)). In such cases, a court must undertake a fairly critical assessment of the evidence to decide whether the officer's testimony could reasonably be rejected at trial. *Plakas,* 19 F.3d at 1147.

## III. DISCUSSION

To prevail on their § 1983 claims, Plaintiffs must that show that Defendants, acting under color of state law, deprived Ms. Fox of a right secured by the Constitution or laws of the United States. *See Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008). Hazelwood and Laughter assert they are entitled to summary judgment based on qualified immunity, a doctrine that protects government employees from liability under § 1983 so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts employ a two-step analysis when assessing whether an official is entitled to qualified immunity: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether

that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

### A. Constitutional Violation

Deadly force claims are analyzed under the Fourth Amendment's objective reasonableness standard. *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). The reasonableness of an officer's use of force depends on the totality of the circumstances, viewed from the perspective of a reasonable officer on the scene, without the benefit of hindsight. *Graham v. Connor*, 490 U.S. 386, 396 (1989). In applying this standard, courts must be mindful that officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. Courts consider, among other factors, the severity of the offense at issue, whether the suspect is actively resisting arrest or attempting to flee, and whether the suspect poses an immediate threat to the safety of officers or others. *Id.* The threat factor is a minimum requirement. *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005). "[A]n officer may not use deadly force against a fleeing suspect unless the suspect is presenting an imminent threat of physical injury or death to the officer or the public." *Stewart v. City of Euclid*, 970 F.3d 667, 681 (6th Cir. 2020).

In deadly force cases involving vehicular flight, "the critical question is whether the officer had objective reason to believe that the fleeing car presents an imminent danger to officers and members of the public in the area." *Latits*, 878 F.3d at 548 (citing *Cass v. City of Dayton,* 770 F.3d 368, 375 (6th Cir. 2014)) (cleaned up). Deadly force is justified against "a driver who objectively appears ready to drive into an officer or bystander with [her] car." *Cass*, 770 F.3d at 375 (citation omitted). However, an officer's use of such force, without a reasonable belief that the suspect's vehicle will be used as a deadly weapon, violates the Fourth Amendment. *See Smith v. Cupp*, 430

7

F.3d 766, 775 (6th Cir. 2005) ("Although this circuit's previous cases give substantial deference to an officer's decision to shoot an unarmed suspect in a car chase, the officer must have reason to believe that the car presents an imminent danger."). Further, deadly force is generally not justified "once the car moves away, leaving the officer and bystanders in a position of safety, unless the officer's prior interactions with the driver suggest that the driver will continue to endanger others with [her] car." *Latits*, 878 F.3d at 548 (6th Cir. 2017) (citing *Cass*, 770 F.3d at 375) (cleaned up). "The Sixth Circuit has found deadly force justified by prior interactions demonstrating continuing dangerousness only when the 'suspect demonstrated multiple times that [she] either was willing to injure an officer that got in the way of escape or was willing to persist in extremely reckless behavior that threatened the lives of all those around.'" *Id.* (citing *Cupp*, 430 F.3d at 775).

Defendants argue that their use of lethal force was justified because they believed Ms. Fox was preparing to run over Hazelwood.[7] [Hazelwood Mem, Doc. 13 at 17–18; Laughter Mem., Doc. 29 at 7–8]. According to their interpretation of events, Ms. Fox aimed the Escalade at Hazelwood and her prior conduct demonstrated her willingness to hurt them. [Hazelwood Mem. at 15, 23; Laughter Mem. at 6]. Plaintiffs contend that neither officer had reason to fear imminent harm when they used deadly force. [Pls.' Resp. at 3]. And Ms. Fox's conduct prior to the shooting demonstrated a persistent desire to flee, but not an intention of harming the officers or others. [*Id.* at 24].

---

[7] Hazelwood also claims that it was his "impression" that Ms. Fox was planning to run over Laughter. [Hazelwood Decl. ¶¶ 18–19]. However, a jury could reject that belief as unreasonable, since Hazelwood was in a position to see that Laughter was not near the Escalade's path. And Laughter acknowledges that he did not believe himself to be in danger. [Laughter Dep. at 57].

This is not an easy case, given that Hazelwood was in proximity to the path of the Escalade. However, viewing the video and other evidence in the light most favorable to Plaintiffs, a jury could find that Laughter's use of force was not justified by an imminent danger to Hazelwood. According to DAG Kevin Allen, who studied the body camera video frame by frame, Laughter began firing as the Escalade completed the reversing motion. At that point, Hazelwood was in front of the vehicle, but its wheels were canted such that Hazelwood was not in the vehicle's direct forward path. Even if, in the heat of the moment, Laughter did not notice the canted wheels, the Escalade was still approximately twenty feet from Hazelwood and had not moved forward. Laughter asserts that he believed Ms. Fox was preparing to run over Hazelwood intentionally. [Laughter Dep. at 67–68]. But a jury could find that belief to be unreasonable since it can be inferred that Ms. Fox was simply attempting to reposition her vehicle to drive out of the field. And she had not demonstrated an intention of harming the officers up to that point.

Even if both officers waited to shoot until the Escalade moved forward, a jury could find that Hazelwood was not in imminent danger. Video appears to show that the Escalade moved forward on a curved path, leading *between* the two officers, not toward the position Hazelwood took when he initially stepped back from the reversing vehicle. Thus, a jury could infer that Hazelwood was not in the Escalade's direct path when it moved forward or that his own movements placed him in its path. Either way, a reasonable officer in Hazelwood and Laughter's position would not have believed that Ms. Fox was intentionally targeting Hazelwood with the Escalade. Moreover, if Hazelwood was in the Escalade's path when the officers fired, it is uncontested that the vehicle was moving slowly. And a jury could find that there was time and space for Ms. Fox to avoid hitting Hazelwood or for Hazelwood to move away to a position of safety. *Thomas v. City of Columbus*, 854 F.3d 361, 366–67 (6th Cir. 2017) ("Sometimes, the time

9

or space available to an officer may mean that the reasonable thing to do is to monitor the suspect, issue a warning, or take cover.").

According to Defendants, Ms. Fox showed her willingness to injure an officer who got in the way of escape when she rammed their vehicles. [Hazelwood Mem. at 16; Laughter Mem. at 6]. However, her collision with Hazelwood's vehicle, which occurred when she was reversing and he was driving up behind her, can be construed as unintentional. *See Latits*, 878 F.3d 541, 550 (6th Cir. 2017) (finding that driver's collision with police vehicles demonstrated an intent to flee, not an intent to harm officers, which was relevant to whether the suspect presented sufficient danger to justify lethal force). Her second contact with Hazelwood's vehicle, which occurred when she edged backward, narrowly scraping his push bumper, can also be construed as accidental. Although Laughter claims that Ms. Fox intentionally rammed his vehicle, the video and TBI crash report diagram show that it was Laughter's vehicle that struck the Escalade.

Further, Defendants contend that Ms. Fox showed she would do anything to escape by leading them on a dangerous high speed chase. [Hazelwood Mem. at 15; Laughter Mem. at 6]. Ms. Fox did exhibit some reckless driving during the pursuit. She used the opposing lane to swerve around another vehicle; drove around a car at a stop sign; and reached speeds of sixty-five miles per hour on a one-lane road with blind curves, although it is unclear based on Hazelwood's testimony at what speed Ms. Fox drove around any curves. Nevertheless, a jury could reject Defendants' characterization of Ms. Fox's flight as a dangerous high speed chase. It was broad daylight in a rural area. She did not reach speeds above seventy miles per hour. And there is no evidence that the roads she travelled were highly trafficked; that she engaged in aggressive driving, such as running another vehicle off the road; or that she came close to having an accident.

Given the foregoing, the Court does not believe that Ms. Fox's driving reached the level of extreme recklessness that has led courts to find that a fleeing suspect's continuing dangerousness to officers and the public warranted the use of lethal force. *Cf. Plumhoff v. Rickard*, 572 U.S. 765 (2014) (finding that an ongoing threat to public safety justified use of lethal force where driver fled from a traffic stop near midnight; swerved through traffic at speeds over one hundred miles per hour, passing more than two dozen vehicles; made contact with two police cruisers; and continued to flee even after officers fired three shots); *Scott v. Clay Cnty.*, 205 F.3d 867 (6th Cir. 2000) (finding lethal force justified by public safety concerns where driver disregarded traffic sign in the late night/early morning; narrowly missed colliding with a police cruiser; forced at least one other vehicle off the road; led officers on twenty minute chase at speeds between eighty and one hundred miles per hour; and eventually lost control of his vehicle, crashed into a fence and raced back to the roadway, prompting an officer who leapt out of the way to shoot at the fleeing vehicle); *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992) (finding that danger to the public justified deadly force where, at night, a driver attempted to elude a traffic stop, reaching speeds in excess of ninety miles per hour; dodged two different police cars that were placed in his way; and when officers attempted to stop him at end of dead-end residential street, sped forward and crashed into the officer's car, before an officer shot him, as he attempted to continue fleeing).

The Court is mindful that Defendants were called upon to make quick decisions in a circumstance that was "tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397. However, "the fact that a situation unfolds relatively quickly does not, by itself, permit officers to use deadly force." *Estate of Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008) (citing *Cupp*, 430 F.3d at 775) (cleaned up). And a jury could find that even in the heat of the moment, Defendants lacked a reasonable belief that Ms. Fox—who was resisting arrest but was wanted

11

Case 2:24-cv-00088-JRG-CRW   Document 52   Filed 09/29/25   Page 11 of 15
PageID #: 793

for non-violent offenses and had not shown aggression toward the officers—was preparing to drive into Hazelwood with her vehicle. Accordingly, viewing the evidence in the light most favorable to Plaintiffs, as the Court must do at summary judgment, Defendants' use of lethal force was not a reasonable response to the level of risk she posed to the officers or the public.

### B. Clearly Established Right

Defendants are still entitled to qualified immunity unless the unlawfulness of their conduct was clearly established at the time they used deadly force. For a right to be clearly established, "the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (citing *Saucier* v. *Katz*, 533 U. S. 194, 202 (2001)) (cleaned up). While a case directly on point is not required, controlling authority or a robust consensus of persuasive authority must place the lawfulness of the officer's conduct beyond debate. *Id.* at 64. The Sixth Circuit has explained that except in an "obvious" case, the *Garner* rule—that a fleeing suspect has a right not to be shot unless she is reasonably perceived as posing an imminent threat of serious harm to officers or others—is cast at too high a level of generality for qualified immunity purposes. *Gambrel v. Knox Cnty.*, 25 F.4th 391, 407 (6th Cir. 2022).

Because Defendants have raised a qualified immunity defense, Plaintiffs bear the burden of demonstrating that the claimed right was clearly established. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (citation omitted). Plaintiffs contend that it is well-established in the Sixth Circuit that an officer may not shoot into a vehicle from as far as twenty feet away when he may easily step out of the way instead. [Pls.' Resp. at 29]. In support of this argument, they cite *Kirby v. Duva*, 530 F.3d 475 (6th Cir. 2008) and *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005). [*Id.*].

However, neither of these cases clearly establish that Defendants' conduct was unlawful. In *Kirby*, officers used lethal force during a roadside arrest, where the suspect, sandwiched between two police vehicles, maneuvered his vehicle backward and forward, in an unsuccessful attempt to escape. *Kirby*, 530 F.3d at 477–80. The Sixth Circuit found that *Garner* clearly established that lethal force was unreasonable, given that the vehicle was moving slowly and came to a stop prior to the shooting; no officers or members of the public were in danger; and the situation unfolded over a two-minute period, providing the officers with sufficient time to assess the situation before firing. *Id.* at 482–83. In *Cupp*, a man arrested for harassing phone calls attempted to drive away in the officer's cruiser, and the officer shot into the back of the vehicle when it had already passed him. *Id.* at 773. Although events unfolded rapidly, the Court denied qualified immunity, reasoning that no person at the scene was ever in danger, making this an "obvious" case, where *Garner* clearly established the right at issue. *Id.* at 774, 776. *Kirby* and *Cupp* were both "obvious" cases where the general *Garner* rule was sufficient to defeat qualified immunity. Neither case involved the use of lethal force while an officer was in proximity to the forward path of a suspect's slowly moving vehicle or a pursuit that involved some reckless driving. These additional factors made the level of risk posed by Ms. Fox less clear than in *Kirby* and *Cupp*.

Plaintiffs also assert that there is a robust consensus of persuasive authority, holding that an officer may not use deadly force to defend against a slowly approaching vehicle that objectively does not pose an imminent danger to the officers or others. [Pls.' Resp. at 30]. In support of this claim, Plaintiffs cite six cases from five other circuits. [*Id.* at 30–31]. However, only two of the cases cited— *Cordova v. Aragon,* 569 F.3d 1183 (10th Cir. 2009) and *Villanueva v. California*, 986 F.3d 1158 (9th Cir. 2021)—involved a vehicular pursuit prior to the use of lethal force. *Cordova* does not directly support Plaintiffs' argument, since in that case, the parties stipulated that there

13

was no immediate danger to the officer using deadly force, and the court only considered the hypothetical danger to third parties. *Cordova*, 569 F.3d at 1187–88. The Court agrees with Plaintiffs that *Villanueva* is on point. There, the officers who used deadly force were near the path of a slowly moving vehicle as it executed a three point turn, following a pursuit that involved some reckless driving. *Villanueva*, 986 F.3d at 1162–64. Denying qualified immunity, the Ninth Circuit found that its precedent "clearly established that an officer violates a person's constitutional rights by shooting at a slow-moving vehicle that the officer could reasonably have side-stepped to remove himself from danger." *Id.* at 1172–73. However, one Ninth Circuit case is insufficient to establish a robust consensus of persuasive authority.

Because Plaintiffs have not born their burden of showing that the claimed right is clearly established, Hazelwood and Laughter are entitled to summary judgment on qualified immunity grounds.

## IV. CONCLUSION

For the reasons discussed above, Hazelwood and Laughter's motions for summary judgment on the federal claims against them [Docs. 11, 27] are **GRANTED**. Defendants have asked the Court to decline to exercise supplemental jurisdiction over the related state law claims. Usually, the Court will decline to exercise supplemental jurisdiction when there are no federal claims remaining. *See* 28 U.S.C. 1367(c)(3); *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966) ("if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."). Given that the federal claims against the entity defendants, Cocke County and Parrottsville, are still pending before the Court, the Court will not dismiss the state law claims against Hazelwood and Laughter at this time.

So ordered.

14

15

ENTER:

            s/J. RONNIE GREER
           UNITED STATES DISTRICT JUDGE